**SALARY POLICY EMPLOYEE PANEL; Office and Professional Employees International Union, AFL–CIO, CLC, Plaintiffs–Appellees,**

v.

**TENNESSEE VALLEY AUTHORITY, Defendant–Appellant.**

No. 97–5560.

United States Court of Appeals, Sixth Circuit.

Argued March 20, 1998.

Decided July 21, 1998.

Melvin S. Schwarzwald (argued and briefed), Todd M. Smith (briefed), Schwarz-

wald & Rock, Cleveland, OH, Helen de Haven, Grundy, VA, for Plaintiffs–Appellees.

A. Jackson Woodall (argued and briefed), Linda J. Sales–Long, Thomas F. Fine (briefed), Tennessee Valley Authority, Knoxville, TN, for Defendant–Appellant.

Before: NELSON, NORRIS, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Defendant–Appellant, Tennessee Valley Authority ("TVA"), appeals from an order of the district court granting partial summary judgment to plaintiffs-appellees, Salary Policy Employee Panel (the "Panel") and Office and Professional Employees International Union, AFL–CIO, CLC ("OPEIU") (together the "appellees"), in an action brought by appellees to compel TVA to submit a grievance to arbitration. The underlying dispute, the merits of which are not before this court, involves whether employees within a new job classification recently created by TVA belong in a bargaining unit represented by OPEIU or one represented by the International Brotherhood of Teamsters (the "Teamsters"). TVA has also appealed the lower court's denial of its motion to dismiss the action for failure to join the Teamsters pursuant to Rule 19(a), FED.R.CIV.P. For the reasons set forth below, we **REVERSE** the district court's decision with respect to the arbitrability issue.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The TVA is a corporate body created pursuant to the Tennessee Valley Authority Act of 1933 for "the purpose of maintaining and operating the properties now owned by the United States in the vicinity of Muscle Shoals, Alabama, in the interest of the national defense and for agricultural and industrial development, and to improve navigation in the Tennessee River and to control the destructive flood waters in the Tennessee River and Mississippi River Basins." 16 U.S.C. § 831; see also Max M. Kampelman, TVA Labor Relations: A Laboratory in Democratic Human Relations, 30 MINN. L.REV. 332, 333–35 (1946) (more extensive discussion of TVA's background). With respect to labor relations, TVA entered into its first collective bargaining contract in 1940 with the Tennessee Valley Trades and Labor Council, and in 1944 the Panel was formed. See id. at 355, 359. TVA's experience with collective bargaining was widely praised in the decades to follow as a model for collective bargaining in the public sector. It is "the oldest example of continuous meaningful bargaining in the public sector, involving all categories of employees" including white-collar and professional employees. Michael L. Brookshire & Michael D. Rogers, Collective Bargaining in Public Employment 2 (1977); see also Natalie L. Griffin, The Wages of Federal Employees: Can We Talk?, 129 MIL. L.REV. 141, 151 (1990) (relating how President Kennedy's Task Force on Employee–Management Relations in the Federal Service, established in 1961, found that " 'in the Tennessee Valley Authority ... relationships that [were] close to full scale collective bargaining between trade unions and management officials [had] been going on for years, to the complete satisfaction of all the parties concerned' "). TVA management has also been characterized as a strong believer in the idea that "employee organizations [are] essentially constructive forces rather than ... necessary evils" and as a successful practitioner of the principles of democratic management, bilateral accommodation, and employee-management cooperation. See Arthur A. Thompson, Collective Bargaining in the Public Service—The TVA Experience and Its Implications for Other Government Agencies, 17 LAB. L.J. 89, 93 (1966). In general, TVA management allows employee organizations to play a fairly meaningful role in determining employee relations policies and procedures and gives these organizations much prestige, and these organizations in turn "serv[e] as a major channel of communication with employees, securing employee cooperation in matters of interest to both TVA management and the employees." Id. at 93–95. It is thus not surprising that most of the TVA workforce is organized in unions. See Appellant's Br. at vi.

TVA is a party to several different collective bargaining agreements with different un-

ions or union associations, the Panel [1] and the Teamsters being two such organizations. Historically, OPEIU which is a constituent union of the Panel has represented TVA's office and related clerical employees (J.A. at 79 (Orr Aff. at 1)) while the Teamsters has represented TVA's trades and labor employees whose work involved warehousing, material handling, and bulk hauling (J.A. at 255 (Hairston Aff. at 2)). In the traditional context, when OPEIU-represented employees [2] worked with Teamsters-represented employees [3] together in warehouses and storerooms, a clear separation existed between those performing clerical work and those physically handling materials and performing manual labor tasks. However, according to TVA, by the 1990s the use of bar-code technology and other computer-based techniques significantly reduced the need for separate clerical employees to receive, store, inventory, and issue materials since those employees handling materials could themselves now enter their actions directly into a materials accounting system using hand-held computers. Appellant's Br. at 8; J.A. at 256 (Hairston Aff. at 3), 144 (Hairston May 26, 1995 Letter at 2). On May 26, 1995, TVA officially announced that it was creating a new job classification called "warehousemen/driver" or "material handler" which in essence combined these relevant clerical and physical handling duties. J.A. at 257 (Hairston Aff. at 4), 143–44 (Hairston May 26, 1995 Letter at 1–2). After discussions with OPEIU and the Panel in late 1994 and early 1995, it was further decided by Peyton Hairston, Jr., TVA's Senior Vice President, Labor Relations, that those employees in this new position would be in the unit that was represented by the Teamsters, rather than in the unit represented by OPEIU.[4] J.A. at 145 (Hairston May 26, 1995 Letter at 3), 254, 257 (Hairston Aff. at 1, 4), 82 (Orr Aff. at 4).

The OPEIU immediately filed a grievance protesting this decision as a direct violation of the representation provisions of the Supplementary Agreements, which are a part of its collective bargaining agreement with TVA. J.A. at 147 (Grievance Form); 82 (Orr Aff. at 4). TVA's collective bargaining agreement with the Panel and its constituent unions consists of three documents: (1) the "Agreement Recognizing Collective Bargaining Rights of Employees and Their Collective Bargaining Representatives," (2) a series of "Articles of Agreement," and (3) a series of "Supplementary Agreements"("S.A.") (together the "Collective Bargaining Agreement"). J.A. at 85–141 (Collective Bargaining Agreement). Insisting that the dispute concerned a jurisdictional matter involving two different collective bargaining agreements not subject to the grievance process, TVA refused to submit the disputed matter to arbitration. J.A. at 156 (Hairston Nov. 7, 1995 Letter). In response, the Panel filed suit on December 8, 1995 seeking to compel arbitration.[5] J.A. at 6 (Compl.).

The district court granted appellees' motion for partial summary judgment, ordered arbitration, and denied TVA's motion to dismiss for failure to join the Teamsters as a party pursuant to Rule 19. J.A. at 32 (Order). TVA's timely appeal of the district

---

1. According to Faye Orr, an International Representative of OPEIU and the chair of the Panel, the Panel is composed of five unions that represent TVA employees in salary policy positions and that negotiate collectively with TVA. Joint Appendix ("J.A.") at 79 (Orr Aff. at 1). The Teamsters, which is not a member of the Panel, has its own separate bargaining agreement with TVA. J.A. at 255 (Hairston Aff. at 2).

2. Typically referred to as "material officers" or "material clerks." Appellant's Br. at 5 n. 3; J.A. at 10 (Compl. at ¶ 13).

3. Typically referred to as "warehousemen." Appellant's Br. at 5 n. 3; see also J.A. at 10 (Compl. at ¶ 13) (also referring to these employees as "warehousemen/drivers")

4. According to TVA, the creation of the new classification and the decision to allow the Teamsters to represent those in the newly-created classification changed the warehouse personnel structure to 112 OPEIU members and 181 Teamsters members where it had previously consisted of 258 OPEIU members and 94 Teamsters members. J.A. at 82 (Orr Aff. at 4).

5. In the alternative, appellees sought relief for breach of contract. In light of the district court's decision to compel arbitration, the district court believed that this issue would naturally be resolved through the arbitration process and thus denied as moot appellees' Motion for Order to Hold Claim of Breach of Contract in Abeyance. J.A. at 30 (Dist. Ct. Op. at 16).

court's judgment has brought the case before this court.[6] J.A. at 34 (Notice of Appeal). The district court had original jurisdiction over this action arising under the Tennessee Valley Authority Act of 1993, 16 U.S.C. §§ 831–831dd (1994), by virtue of 28 U.S.C. §§ 1331 and 1337. This court has appellate jurisdiction, pursuant to 28 U.S.C. § 1291, over the district court's final judgment entered on February 27, 1997.

## II. ANALYSIS

### A. Standard of Review

■■■ As is the case with all contract interpretation, the proper interpretation of a collective bargaining agreement is determined de novo by this court. *See Weimer v. Kurz–Kasch, Inc.,* 773 F.2d 669, 671 (6th Cir.1985), *as amended on denial of rehr'g.* It is also well-settled that unless the parties have clearly agreed to arbitrate the arbitrability issue, it is for a court, and not an arbitrator, to decide in the first instance whether a dispute is to be resolved through arbitration. *See AT & T Techs., Inc. v. Communications Workers,* 475 U.S. 643, 649, 651, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *Salary Policy Employee Panel v. Tennessee Valley Auth.,* 868 F.2d 872, 877 n. 2 (6th Cir.1989) (quoting *AT & T Techs.,* 475 U.S. at 651, 106 S.Ct. 1415) [*Salary Policy II* ]. The merits of the underlying dispute are irrelevant to resolving an issue of arbitrability. *See AT & T Techs.,* 475 U.S. at 649, 106 S.Ct. 1415.

■■■ In contrast, a district court's denial of a Rule 19 motion to dismiss will be reviewed only for abuse of discretion where the denial is based on a finding that the party is not necessary to the action under Rule 19(a), FED. R. CIV. P. *See Keweenaw Bay Indian Community v. Michigan,* 11 F.3d 1341, 1346 (6th Cir.1993); *Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.,* 753 F.2d 1512, 1521 (9th Cir.1985); *EEOC v. Brown & Root, Inc.,* 688 F.2d 338, 341 (5th

Cir.1982). *But cf. Keweenaw Bay,* 11 F.3d at 1345 (noting that a district court's indispensability decision under Rule 19(b) is to be reviewed de novo).

### B. Arbitrability of the Dispute

The main issue before this court is whether TVA is required to submit to arbitration a grievance regarding the proper bargaining representative for those employed under a newly-created job classification. Section D of S.A. 11 provides for arbitration of any "claim of misapplication or misinterpretation of an express provision in a supplementary agreement." J.A. at 126 (S.A. 11: D). The grievance filed by OPEIU on May 26, 1995 asserted several violations of express provisions of S.A. 1 and S.A. 4. J.A. at 147 (Grievance Form). In particular, appellees point to section A of S.A. 1, entitled "Defined Bargaining Units," which defines the unit represented by OPEIU to include "classes of positions the duties of which are *closely related* to office operations and related clerical functions." J.A. at 95 (S.A. 1: A.2.) (emphasis added). Article I.A. of the Articles of Agreement provides that OPEIU "represents all employees holding positions in schedules SA and SB." J.A. at 90 (Articles of Agreement: I.A.). Schedules SA and SB are in turn defined in S.A. 4 as follows:

> Administrative Schedule (SA) includes all classes of positions which involve *primarily* management-service functions, both professional and administrative, such as ... information, procurement, property and supply, and other closely related management-service functions....
>
> Clerical and General Services Schedule (SB) includes all classes of positions which involve *primarily* general or specialized clerical, secretarial, and stenographic functions, office machine and computer operations, communications services functions....

J.A. at 104 (S.A. 4: B.1a & b) (emphasis added). Thus, appellees contend that the underlying dispute at issue here is subject to

---

6. TVA also made a motion to suspend the district court's order pending appeal. The district court's denial of this motion was entered on August 1, 1997. J.A. 451–52, 454–55. It is un-

clear why TVA states that this motion was still pending at the time it filed its brief on September 4, 1997. Appellant's Br. at 6.

arbitration pursuant to the Collective Bargaining Agreement because it is a dispute regarding a misinterpretation or misapplication of S.A. 1's and S.A. 4's definition of the scope of the bargaining unit to be represented by OPEIU. Appellees' Br. at 19. TVA, on the other hand, maintains that specific provisions of the Collective Bargaining Agreement as well as historical/past practice leaves the resolution of such issues to the senior labor relations official at TVA to resolve outside of the arbitration process. Appellant's Br. at 4.

We begin by briefly examining TVA's rather unique labor relations background. The TVA personnel system is independent of the competitive civil service laws pursuant to Section 3 of the TVA Act, 16 U.S.C. § 831b (1994), and, as a federal corporation, TVA is specifically exempt from the provisions of the National Labor Relations Act ("NLRA"), see 29 U.S.C. § 152(2), the Labor Management Relations Act, see 29 U.S.C. § 142(3), and the Federal Labor Relations Act, see 5 U.S.C. § 7103(a)(3)(E). See International Ass'n of Machinists v. Tennessee Valley Auth., 108 F.3d 658, 663 (6th Cir.1997). While this court has held that, despite such exemptions, the federal common law of contracts as well as principles of private sector arbitration law remain applicable to interpreting collective bargaining agreements involving government agencies, see id. at 664, the situation presented by the instant case is complicated slightly by the fact that the Collective Bargaining Agreement includes the following provision:

> TVA and the Panel recognize that their relationship is established under Section 3 of the TVA Act, the "Agreement Recognizing Collective Bargaining Rights of Employees and Their Collective Bargaining Representatives," the Articles of Agreement and supplementary agreements, and *the history of relations* between TVA and the Panel, not pursuant to any *other legislation not specifically applicable* to TVA or to any other requirements. The parties agree that *the unique foundation of this relationship* shall be considered in interpreting this bi-lateral Agreement rather than *the principles developed for regulated labor relations arrangements.*

J.A. at 89 (Agreement Recognizing Collective Bargaining Rights of Employees and Their Collective Bargaining Representatives at 2) (emphasis added). In *Salary Policy II,* this court noted in dicta that the addition of such a provision made it unclear whether it was still appropriate to apply principles of private sector arbitration law to disagreements among the signatory parties but ultimately left the issue unresolved. *Id.,* 868 F.2d at 877.

 Since both parties rely heavily on this provision, we believe some discussion of this provision will be helpful. While we conclude that under this provision traditional and past practice between the parties can be considered as evidence of "the history of relations" between TVA and the Panel and "the unique foundation of this relationship" and can be relied on to challenge the appropriateness of applying a particular principle of private-sector arbitration law, we stress that such extrinsic evidence should be considered by a court only where the language of the Collective Bargaining Agreement is ambiguous. *Cf. Baker Perkins, Inc. v. Midland Moving and Storage Co.,* 920 F.2d 1301, 1305 (6th Cir.1990). We pause to observe that the district court was, in any event, correct not to apply a presumption of arbitrability in this case since the arbitration clause at issue here was narrowly drawn to be exclusive rather than inclusive. J.A. at 20, 26 (Dist. Ct. Op. at 6, 12 (citing *Salary Policy II,* 868 F.2d at 877)). Moreover, it is important to understand that while TVA is statutorily exempt from the provisions of various labor statutes, this does not prohibit TVA from contractually agreeing to a provision or principle borrowed from one of these statutes.

TVA initially emphasizes that the absence of a statutory framework to establish or define bargaining units at TVA, the problems one would encounter in leaving such decisions to a grievance process when only some of the interested parties may be involved, as well as the historical practice of allowing TVA Labor Relations to resolve such disputes among unions require that issues of representation be left to TVA's senior labor relations official. Appellant's Br. at 4, 12–13. But these arguments miss the obvious point

that TVA has a duty to arbitrate if that is what it specifically agreed to do in the Collective Bargaining Agreement. The starting point is thus the language of the Collective Bargaining Agreement. See Local 670, United Rubber, Cork, Linoleum and Plastic Workers v. International Union, United Rubber, Cork, Linoleum and Plastic Workers, 822 F.2d 613, 619 (6th Cir.1987), cert. denied, 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988). TVA directs us to two particular provisions in the Collective Bargaining Agreement to support its assertion that arbitration is not appropriate here. Since the first provision seems to deal with representational disputes and the second with jurisdictional or work assignment disputes, there would normally be an issue of how the underlying dispute should be characterized. In Local 58, Int'l Bhd. of Elec. Workers v. Southeastern Mich. Chapter, Nat'l Elec. Contractors Ass'n, 43 F.3d 1026 (6th Cir.1995), this court explained that "[t]he scope of the unit determines 'what employees the unit represents'" while jurisdiction relates to the " 'assignment of work to union members.'" Id. at 1032–33 (citations omitted). However, as a practical matter these two concepts can often be difficult to distinguish,[7] see Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 268, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), and here, we need not answer this particular question since, as we explain below, pursuant to the Collective Bargaining Agreement, under either characterization, resolution of this dispute has been specifically left to TVA Labor Relations.

**7.** The difficulty arises from the fact that one could characterize this grievance as a dispute over which bargaining unit these employees in the new classification should be placed in (i.e., which unit will represent them) or as one over which union's members will fill the positions under the new job classification.

**8.** This argument was not addressed in the district court's opinion, probably because this provision was not specifically mentioned by TVA in its brief to the district court. J.A. at 174 (Def.'s Br. in Support of Mot. To Dismiss or For Summ. J. and Resp. To Pls.'s Mot. For Partial Summ. J.); Appellees' Br. at 21. While we recognize that the general rule is that an appellate court should confine its review to issues raised below, we note that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the

## 1. Assuming Dispute is Related to Representation

■ We first examine TVA's argument that arbitration is inappropriate here because Article I.C. of the Articles of Agreement allows "[t]he TVA official responsible for Labor Relations [to] resolve[ ] questions concerning the appropriateness of a proposed bargaining unit."[8] J.A. at 90 (Articles of Agreement: I.C.). Appellees respond by pointing to a statement made by TVA in a pleading it filed in a prior action brought by the Panel against TVA "admitting" that Article I.C. relates only to disputes between constituent unions of the Panel and not to disputes between a Panel constituent union and a union that is not a member of the Panel: "With regard to disputes between salary policy unions, the Articles of Agreement make clear '[t]he Director of Labor Relations resolves questions concerning the appropriateness of a proposed bargaining unit.'" Appellees' Br. at 21, Addendum at 10 (Br. in Supp. of Def.'s Mot. to Dismiss or For Summ. J., Salary Policy Employee Panel v. Tennessee Valley Auth., Case No. 1–89–12, E.D. Tenn.). Yet, this statement does not go so far as to assert that Article I.C. refers only to disputes among salary policy unions. In fact, the plain language of Article I.C. does not support such a limited reading, and Article I.D. of the Articles of Agreement, which seems to continue the discussion begun in Article I.C.,[9] provides strong support for the view that Article I.C. does apply to disputes

courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In light of the purely legal nature of this argument, the goal of avoiding injustice will be better served if we were to consider this argument on appeal.

**9.** Article I.C., in its entirety, provides the following:

The TVA official responsible for Labor Relations resolves questions concerning the appropriateness of a proposed bargaining unit. The union which proposes to represent a bargaining unit makes a request to that official for a determination of the appropriateness of such unit and gives supporting reasons for its request. The request is accompanied by evidence that a majority of the employees in the

over the appropriateness of bargaining units whose representatives are not yet members of the Panel. Article I.D. allows "[a] union that has been recognized as the representative of an appropriate bargaining unit [under Article I.C. to] seek to be a member of the Panel and thereafter participate in the collective bargaining process under the Articles of Agreement." J.A. at 90 (Articles of Agreement: I.D.).

▆▆▆▆▆▆ Appellees' assertion that TVA's exemption from the NLRA bars TVA from arguing that Article I.C. is referring to the statutory NLRA concept of "appropriateness of a proposed bargaining unit" is equally unpersuasive. Appellees' Br. at 22. As we stated previously, while NLRA principles do not automatically apply to TVA, TVA is certainly free to bind itself to a particular concept through the inclusion of a mutually agreed upon provision in a collective bargaining agreement. The predecessor provision contained in the original collective bargaining agreement between TVA and the Panel specifically mentioned that "[i]n defining appropriate units for collective bargaining purposes the principles generally utilized by the National Labor Relations Board will be applicable [and that q]uestions concerning the appropriateness of a proposed bargaining unit will be resolved by the Director of Personnel," (J.A. at 401 (Original Articles of Agreement Between TVA and Salary Policy Employee Panel: III)). Moreover, the portion of Article I.C. that refers to the idea of majority support for the representative is reminiscent of the analysis that is undertaken to determine whether a union deserves recognition as a representative under the NLRA. *See* 1 PATRICK HARDIN, THE DEVELOPING LABOR LAW 376 (3d ed.1992). In the NLRA context, a bargaining unit ("a grouping of two or more employees aggregated for

the assertion of organizational rights or for collective bargaining") is appropriate if the employees in it share a community of interests—a determination that is made upon consideration of several factors, including similarity in skill, interests, duties, and working conditions. *Id.* at 448–49; *see also Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1157 (6th Cir.1996). Here, the resolution of the underlying issue would depend at least in part on whether these employees under the new classification share a community of interests with those in the bargaining unit represented by the OPEIU or with those in the bargaining unit represented by the Teamsters. *See Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1156–57 (6th Cir.1996). The community of interests test is used not only to determine the proper unit for previously unrepresented employees but also to alter the scope of an existing represented unit or to clarify whether certain employees properly belong to an already established or generally defined bargaining unit. *See* 1–2 HARDIN, *supra*, at 451, 1816; *Mitchellace*, 90 F.3d at 1156–57.

## 2. Assuming Dispute is Related to Jurisdiction or Work Assignment

▆▆▆ TVA also points to section C of S.A. 1, entitled "Resolution of Disputes," which states that "[d]isputes with respect to the assignment of new classes to defined bargaining units, the establishment of classes not assigned to any bargaining unit, or the designation of excluded classes will be resolved by Labor Relations," as evidence that the dispute here is excluded from the arbitration process.[10] J.A. at 95 (S.A. 1: C). This argument was rejected by the district court below. The district court concluded that the first category clearly encompassed only those disputes *among* Panel unions, and not disputes between a Panel union and *a non-*

---

proposed bargaining unit wish to have that union be the representative of the unit. J.A. at 90 (Articles of Agreement: I.C.).

10. The district court likewise concluded that the second category was inapplicable because it believed that "classes not assigned to any bargaining unit" was referring to a later section of S.A. 1 (entitled "Nonbargaining Unit Work") which listed several types of leadership or disciplinary

positions not subject to the provisions of the Articles of Agreement. J.A. at 24–25 (Dist. Ct. Op. at 10–11), 95 (S.A. 1: E). The third category of disputes does not seem applicable at all and thus will not be explored. The third category concerning "excluded classes" refers to section D of S.A. 1 which excludes from the bargaining units defined in section A of S.A. 1 "[c]ertain confidential nonmanagement positions in salary policy schedules." J.A. at 95 (S.A. 1: D).

*Panel union* since the only unions that are listed as "defined" bargaining units under section A of S.A. 1 are Panel unions. J.A. at 24 (Dist. Ct. Op. at 10), 95 (S.A. 1: A).

Two factors lead us to disagree. First, we believe that the phrase "defined bargaining units" refers to all bargaining units defined in the TVA employment structure, and not just to those defined bargaining units that are members of the Panel. We base this conclusion on the contrasting language in S.A. 1.D. which specifically uses the phrase "the bargaining units defined in S–1:A above" to refer to those defined bargaining units within the Panel. Furthermore, even assuming that "defined bargaining units" means only those bargaining units defined in S.A. 1.A., we believe that under a plain reading, "[d]isputes with respect to the assignment of work" refers not only to disputes over the assignment of new classes of work [11] but as well to disputes over the non-assignment of new classes of work. This is the logical reading of the provision. We also note that it would be improper to assume that the *assignment* (as opposed to non-assignment) of new classes of work to a bargaining unit is typically an action that is favored by the union representing the bargaining unit. We point to our opinion in *Local 58* as one recent example of a situation in which the assignment of a new class of work to a bargaining unit has been fiercely contested by the union representing the bargaining unit. The dispute in *Local 58* involved the employer's addition of a "material handlers" classification to a bargaining unit so that these employees could take over certain tasks of moving materials and tools from one area of a job site to another that were previously performed by foremen and journeymen electricians in the same bargaining unit. *See id.*, 43 F.3d at 1029, 1033. Although the regrouping of work tasks allowed the company to lower its composite crew

costs, the union was against the addition because material handlers would be performing the same work as foremen and journeymen electricians but paid less.

We thus conclude that under the Collective Bargaining Agreement, appellees' grievance with TVA is not subject to arbitration. While extrinsic evidence of historical relations between the parties can be considered under the Collective Bargaining Agreement where the language is ambiguous, we believe the language of the Collective Bargaining Agreement clearly allows TVA Labor Relations to resolve the dispute at issue here.

**C. Dismissal for Failure to Join a Party Pursuant to Rule 19(a)**

TVA's second argument on appeal is that the district court improperly denied its motion to dismiss for failure to join the Teamsters pursuant to Rule 19(a), FED. R. CIV. P. Rule 19(a) requires that

> [a] person ... shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of the claimed interest.[12]

FED.R.CIV.P. 19(a). Relying on the second clause of Rule 19, TVA claims that (1) the Teamsters has an interest in its continued representation of those employed under the new classification, and (2) TVA will be subject to potentially inconsistent obligations if the Teamsters is not joined as a party to the action.[13] Appellant's Br. at 27. However, in

---

**11.** Both TVA and appellees agreed at oral argument that S.A. 1.C. is referring to new classes "of work" and not to new classes "of positions."

**12.** Rule 19(a) requires joinder of "necessary" parties *only if feasible.*

**13.** It is quite clear that clause (1) of Rule 19 would be of little assistance to TVA since the

district court can grant all the relief sought by the Panel—an order to compel arbitration—without the Teamsters's presence in the action. The order to compel arbitration requires the Teamsters neither to do anything nor to change its position in any way. *See Local 670,* 822 F.2d at 620.

light of our conclusion above that the underlying dispute is not subject to arbitration, there is no need for us to decide this issue at this time.

### III. CONCLUSION

The judgment of the district court mandating that the dispute be submitted to arbitration is **REVERSED.**